## Case No. 14,426.

UNITED STATES v. ALBERTY.

[Hempst. 444.] [1]

Circuit Court, D. Arkansas.   April, 1844.

CRIMINAL LAW — FEDERAL JURISDICTION — INDIAN COUNTRY.

1. The circuit and district courts of the United States can take cognizance of civil and criminal matters only so far as the power so to do is conferred upon them by statutes of the United States.

2. The jurisdiction of these courts, so far as it results from the terms of their creation, or is necessarily implied in their constitution, is restricted to the territorial limits within which they are placed.
[Cited in Ex parte Kang-gi-shun-ca, 109 U. S. 560, 3 Sup. .Ct. 396.]

3. Acts of congress of the 30th of March, 1802 [2 Stat. 139]. and of the 30th of June, 1834 [4 Stat. 729], to regulate intercourse with the Indian tribes and preserve peace on the frontiers; the act of 3d of March, 1825 [4 Stat. 115], relating to crimes against the United States; the act of 15th June, 1836 [5 Stat. 50], admitting Arkansas into the Union, and the act of March 3d, 1837 [5 Stat. 176]. amendatory of the judicial system of the United States, commented on and explained.

4. Courts of the United States are of limited, though not of inferior. jurisdiction; and hence

1 [Reported by Samuel H. Hempstead, Esq.]

their jurisdiction must, in every instance, be apparent on the face of the pleadings.

5. The circuit court of this district, in the absence of any statute attaching the Indian country west of Arkansas thereto, has no jurisdiction over such Indian country, and cannot punish an offence committed therein.

[Cited in U S. v. Starr, Case No. 16,379; U. S. v. Ivy, Id. 15,451.]

Indictment [against Moses Alberty] for murder.

G. D. Royston, U. S. Dist. Atty.

A. W. Arrington and Albert Pike, for the prisoner.

Before DANIEL, Circuit Justice, and JOHNSON, District Judge.

DANIEL, Circuit Justice.   At the very threshold of this case the court is met by the important inquiry, whether it has jurisdiction to try the offence with which the prisoner stands charged.   This offence is murder, alleged to have been committed by the prisoner, who is an Indian, upon the body of a white man, without the limits of the state and district of Arkansas, within the Indian country.   On either side of the question here propounded, it is admitted that the circuit and district courts of the United States can take cognizance of matters, civil or criminal, so far only as the power so to do is conferred upon them by statute; and it would seem to be a proposition equally plain as a general one, that the jurisdiction of those courts, so far as it results from the terms of their creation, or is necessarily implied in their constitution, is restricted within the territorial limits within which they are placed.   Amongst the exceptions to this general principle, or perhaps it might with stricter propriety of language be said, amongst the instances which extend the powers of these courts beyond the restrictions above laid down (and there are unquestionably such), are said to be certain provisions in the acts of congress which vest this court with cognizance of the offence on which the accused now stands before us; that is, which authorize the trial before the circuit court of the district of Arkansas of a murder committed by an Indian upon a white man out of the district of Arkansas, as defined by the law creating the state, without the limits of any circuit of the United States, and within the Indian country. Let the provisions relied on for this position be traced and compared, in order to ascertain how far the position can be sustained by them. By the act of congress "to regulate trade and intercourse with the Indians, and to preserve peace on the frontiers," approved on the 30th March, 1802, the government of the United States assumed jurisdiction over the Indian country, by enumerating many acts which should be punished as offences, if committed within that country, and by authorizing certain courts designated in the statute to take cognizance of them.

It will be perceived, however, that most of the offences thus denounced are such as should be committed by white men, and that in the enumeration in that statute is not included murder committed by an Indian, within the Indian boundary, on the body of a white man.

It is presumed, therefore, that the statute of March 30th. 1802, can have no application to a case like that at bar. On the 3d day of March, 1825, was passed the law entitled "An act more effectually to provide for the punishment of certain crimes committed against the United States." The crimes enumerated in this act, so far as locality beyond the limits of the state is imparted to them by the law, will be found to belong naturally and properly to the maritime jurisdiction of the Union, or to be in some degree connected therewith by operation of express law. The 14th section of the above statute contains the following clause, at the close of that section: "And the trial of all offences which shall be committed upon the high seas, or elsewhere, out of the limits of any state or district, shall be in the district where the offender is apprehended, or into which he may be first brought." The offence charged in the indictment being committed in the Indian country, and consequently out of the limits of a state or district. It is insisted for the prosecution that the clause of the law above mentioned brings it within the jurisdiction of the circuit court for this district, the accused having been first brought therein. With regard to this argument it may, in the first place, be remarked, that implications of power are scarcely allowable in any cases in relation to the courts of the United States. They have repeatedly, even in civil cases, been adjudged to be courts of limited, though not of inferior, jurisdiction; and it has been in like manner required that their jurisdiction must in every instance be apparent on the face of the pleadings. A fortiori, then, would such implications be discountenanced in penal or criminal proceedings, and still more would they be disclaimed where the issues of life and death are involved. But, conceding for the present that such implications could be permitted, it may be asked whether there is not enough on the face of the act of 1825 fully to answer and satisfy the clause of the 14th section, without attempting to extend that clause so as to embrace other matter than that which the statute expressly and plainly embraces. Amongst the offences of which the statute was treating, many of them were of a character which might be consummated within the limits of the states and districts of the Union. Others, as for instance those touching the maritime rights of the nation and its citizens, were of a nature to be committed beyond those limits. such as the destruction of ships on the high seas and in foreign ports, and the abandoning of seamen in

foreign countries; for these delinquencies it was necessary to designate a forum, and public convenience pointed to the state or district in which the offender might ·be apprehended, or that into which he should happen to be first brought. This interpretation of the statute appears to satisfy both its language and its reason, and to forbid forcing its provision to purposes within neither its natural nor necessary scope.

On the 30th June, 1834, there was passed an act of congress with a title similar to the act of 1802, namely, "An act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers." In most of its provisions, this act is a literal transcript from the act of 1802, and like the latter law, it comprises nowhere in the enumeration of offences the crime of murder by an Indian on the body of a white man, committed within· the Indian country; but the act of 1834, in its 24th and 25th sections, contains the following provisions. It declares, "that so much of the laws of the United States· as provide for the punishment of crimes committed within any place within the sole and exclusive jurisdiction of the United States shall be in force in the Indian country, provided, that the same shall not extend to crimes committed by one Indian against the person or property of another Indian; and that for the sole purpose of carrying into effect that act, all that part of the Indian country west of the Mississippi river that is bounded north by the north line of lands assigned to the Osage tribe of Indians, produced east to the state of Missouri, west by the Mexican possessions, south by Red river, and east by the west line of the territory of Arkansas and state of Missouri, shall be and the same is hereby annexed to the territory of Arkansas." The region thus described is admitted to be Indian country, and it is within its limits that the crime alleged in the indictment is charged to have been committed. As cognizance of crimes and offences generally, and certainly of the crime of murder, by whomsoever committed, within forts, dockyards, arsenals, on the high seas, and in all other places within the exclusive jurisdiction of the United States, is unquestionably given to the courts of the United States designated by law for the trial of those offences, and as the Indian territory above described has been placed under this exclusive jurisdiction of the courts of the United States, and by the same law has ·been annexed to the territory of Arkansas, as little can it be doubted that by virtue of this statute of 1834 jurisdiction of the like crimes was vested in the courts of the United States for the territory of Arkansas. But how and by what means, and to what extent, was this jurisdiction so vested? Solely by the extension to the Indian country of the laws punishing crimes in places within the exclusive jurisdiction of the United States, and by the annexation of that country, for the purpose of enforcing those laws, to the territory of Ar-

kansas; for it cannot be reasonably contended, that the mere creation of the territorial government would clothe it with power over a people, and over regions beyond the boundaries of the territory, and with which it had no inherent or necessary connection.

These special provisions, made by congress, are in themselves an admission of their necessity, of their previous non-existence as a part of the territorial jurisdiction, and of their peculiar and limited annexation to that jurisdiction by force of that statute alone. By an act of congress approved on the 13th June, 1836, the state of Arkansas was admitted into the Union; its limits and boundaries as a state were by that act ascertained and fixed, and the state was created a judicial district. By the operation of this ·act of congress, the territorial government of Arkansas may be said to have been annihilated. Its political and civil powers were transferred to other functionaries: those of a peculiarly internal character, to functionaries of the newly formed state; those which bore any relation to the system of which the state formed a part, to functionaries holding new and distinct commissions under that system, and possessing no powers save those to be derived from those commissions. Then as one of the states of the Union, and in virtue of that character forming one of the districts of the United States, the state of Arkansas and the federal powers within that state would possess no peculiar jurisdiction or authority; none which did not appertain to other districts and the circuit court having cognizance of matters within those districts. To invest the federal courts within the state and district of Arkansas with such peculiar powers, some special legislation would appear to be indispensable. Has any such special legislation taken place? We have been able to perceive nothing of the kind in the act which invested the district court of the state of Arkansas with circuit court powers; and if the act of March 3, 1837, entitled "An act supplementary to the act entitled an act to amend the judicial system of the United States," which created a circuit court within the state of Arkansas, be examined, it will be found equally destitute of any similar provisions. This act last mentioned first revokes simply the circuit court powers theretofore existing in several district courts, of which the district court of Arkansas was one, and declares that within the several districts named circuit courts shall be held by the chief or associate justices of the supreme court of the United States. assigned or allotted to the circuit to which such district shall belong, and the district judges of such districts severally and respectively; either of whom shall constitute a quorum. Nay, this act would seem to inhibit and exclude the exercise of any extraordinary or peculiar power, either by the circuit or district judges, within the newly created districts or circuits, for the law proceeds to declare: "Which circuit courts, and the judges thereof, shall have

like powers and exercise like jurisdiction as other circuit courts and the judges thereof, and the said district courts and the judges thereof shall have like powers and exercise like jurisdiction as the district courts and judges thereof in other circuits."

Upon the whole, then, we conclude that no power exists by law in the circuit court of the district of Arkansas which does not appertain to other circuit courts of the Union; that the power and jurisdiction now claimed for the court is a peculiar and extraordinary power, and does not belong to it regularly by its constitution, nor has been bestowed upon it by any special legislation. We think, therefore, that it cannot be legally and properly exercised, and that the court cannot take cognizance of the prisoner's case. Prisoner discharged.